## STANDARD ABSTRACT & TITLE COMPANY, INC.
## *v.* RECTOR-PHILLIPS-MORSE, INC.

83-268                                        666 S.W.2d 696

Supreme Court of Arkansas
Opinion delivered March 26, 1984
[Rehearing denied April 30, 1984.]

*Plegge & Church,* by: *Beresford L. Church, Jr.,* for appellant.

*Rose Law Firm, A Professional Association,* by: *Vincent Foster, Jr.,* for appellee.

*W. Dent Gitchel,* for Amicus Curiae Arkansas Realtors Association.

P. A. HOLLINGSWORTH, Justice. In April, 1981, Appellant Standard Abstract and Title Company, Inc., (hereinafter Standard) entered into an exclusive listing contract for a period of twelve months with the Appellee, Rector-Phillips-Morse, Inc., (hereinafter RPM) for the sale of an office building. In February, 1982, Standard attempted to cancel the listing contract and proceeded to accomplish a sale of the property through another broker to Gary Eubanks and Hugh Spinks d/b/a Gary Eubanks and Associates. In December of 1981, an RPM salesman had shown the property to Eubanks.

The sale to Eubanks was consummated on March 25, 1982. Standard received $50,000.00 in cash and Eubanks assumed the obligation for mortgage loans totaling $608,552.52. RPM filed suit for a commission of seven percent of the gross consideration.

After a full trial on the merits, the trial judge, sitting as a jury, held that RPM had performed all its obligations under the exclusive listing contract, or that any nonperformance had been waived or excused by Standard's conduct. The trial court further found that during the term of the listing contract RPM did not consent to a cancellation of the contract, either verbally or by conduct, and that therefore, there was no cancellation of the contract by mutual consent. The trial court also held that the letter and intent of Ark.

Stat. Ann. § 71-1302 does not bar RPM, as a corporation, from recovery.

We affirm.

Standard's first point on appeal is that RPM does not hold an Arkansas real estate broker's or salesman's license because corporations are not individuals as required by Ark. Stat. Ann. § 71-1302 (Repl. 1979), therefore, RPM cannot sue to collect a commission. The argument is advanced that § 71-1302 is analagous to § 64-1202, a statute imposing a penalty on foreign corporations which do business in Arkansas without a certificate of authority. In *Alexander Film Co.* v. *State ex rel Phillips County*, 201 Ark. 1052, 147 S.W.2d 1011 (1941), we discussed § 64-1202 and stated that since it is a penal statute, it must be strictly construed in favor of those against whom the penalty is sought. If a real estate firm such as RPM cannot take the listing in the firm name, they would have to require sellers to enter into mutually dependent listing contracts with each of the firm's licensed brokers and salespersons who might participate in the sale. We agree with the Amicus Curiae position that the purpose of the real estate statutes is to protect the public from unlicensed brokers and salespersons, not to prevent those properly licensed persons from doing business in a corporate form. Throughout the statutory scheme, there are numerous references to brokers doing business in "firms." See Ark. Stat. Ann. § 71-1306 (a)(d)(e)(f) (Supp. 1983). Since corporations can only act through their agents, so long as the salespersons and brokers employed by real estate firms are licensed, then the requirements mandated by the statute are being met. Construing the statute in favor of the party against whom the penalty would be imposed, § 71-1302 does not prevent licensed real estate brokers and salespersons from suing in their corporate name to collect a commission due them.

Standard's second point on appeal is that the trial court erred in holding that their listing contract had not been effectively cancelled, therefore, the sale to Eubanks occurred within the listing period. In support of their position, Standard argues that RPM did not fulfill its obligation

under the contract to submit a plan on marketing a condominium project for the building. This plan was to be presented within sixty days from April 13, 1981. Sometime in September 1981, RPM made some effort to put together a group for purchase of condominiums, but the attempt was unsuccessful. There is no doubt as we review the record that this plan was abandoned by both parties and on December 23, 1981, RPM submitted to Standard an offer for $700,000.00 from a prospective buyer. Standard rejected this offer as insufficient.

On February 11, 1982, Gerald Cathey, the president of Standard, informed RPM that they desired to cancel the exclusive listing contract and by letter of February 23, 1982 that Standard would protect RPM's commission on any prospects to whom RPM had shown the building. RPM furnished the list on March 23, including the name of Gary Eubanks, two days before the building was sold to Eubanks. The trial court found that RPM:

> had performed all its obligations under the contract, or any non-performance had been waived or excused by the defendant's [Standard's] conduct. During the term of the contract there was no cancellation of the contract by mutual consent; specifically Rector-Phillips-Morse did not consent to a cancellation of the contract, either verbally or by conduct.

We agree. Although parties to a contract may rescind it by mutual agreement, *Leonard* v. *Downing*, 246 Ark. 397, 399, 438 S.W.2d 327 (1969), the party claiming the contract has been rescinded has the burden of proving such claim. *Hicks* v. *Woodruff*, 238 Ark. 481, 382 S.W.2d 586 (1964). To prove rescission, the appellant must demonstrate mutual assent because, as we said in *Novakovich* v. *Union Trust Co.*, 89 Ark. 412, 117 S.W. 246 (1909), "[W]here the agent has been employed for a fixed period the agency can not be rightfully terminated before the expiration of that period at the mere will of the principal."

We cannot say RPM's conduct was unequivocal evidence of mutual assent to rescission of the listing

contract. Factors and actions undertaken by both parties in fact indicate a contrary intention. In their effort to syndicate the property, RPM spent $4,000.00 of its own money and after this approach failed, Standard never objected to their efforts to sell the property as a unit rather than as condominiums. In an effort to sell the property as a unit, RPM showed the property to at least fourteen buyers, and from these there was one firm offer that was over $41,000.00 more than the property ultimately sold for. The telling point in the entire scenario can be put into one act by Standard. The letter of February 23, 1982 by Standard's Gerald Cathey plainly states, "of course, we will protect you for your commission on any of the prospects that you have shown the building to." This letter was consistent with the terms of the exclusive listing contract of April 13, 1981. On this point, the contract stated in clear terms that if the property was sold *after* the listing period and such sale was based on information obtained through RPM, then RPM would be conclusively presumed to be the cause of such sale. It is undisputed that RPM showed the property to the eventual buyer, Eubanks, during the listing period. For the aforementioned reasons, we affirm the judgment in the amount of $46,096.58.

Affirmed.

HAYS, J., not participating.